No. 24-12916

# In the United States Court of Appeals for the Eleventh Circuit

United States of America,
*Appellee*

*v.*

Latona Mae Lambert,
*Defendant-Appellant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA

**OPENING BRIEF OF APPELLANT**

CATHERINE E. STETSON
J. SCOTT BALLENGER
LANCE J. LEDET, JR.
  *Third Year Law Student*
ALEX WEBB
  *Third Year Law Student*
APPELLATE LITIGATION CLINIC
UNIVERSITY OF VIRGINIA SCHOOL OF LAW

  *580 Massie Road*
  *Charlottesville, Virginia 22903*
  *(202) 701-4925*
  *sballenger@law.virginia.edu*

*Counsel for Appellant*

# CERTIFICATE OF INTERESTED PERSONS & CORPORATE DISCLOSURE STATEMENT

## United States v. Lambert

## Case No. 24-12916

Per Circuit Rule 26.1, undersigned counsel certifies that the following have an interest in the outcome of this appeal:

1. Ballenger, J. Scott, *Counsel for Appellant*

2. Curry, Jennifer, *Trial Attorney for Defendant*

3. Daniels, Monica, *Assistant United States Attorney*

4. Debrow, Jr., Barry, *Trial Attorney for Defendant*

5. Debrow, Kimberly Bourroughs, *Trial Attorney for Defendant*

6. Flynn, Zhanay, *Co-Defendant*

7. Fritz, Antenesha, *Co-Defendant*

8. Lambert, Latona, *Defendant-Appellant*

9. Ledet, Jr., Lance, *Third-Year Law Student*

10. McEwen, Leah, *Assistant United States Attorney*

11. Odom, Joy, *Former Assistant United States Attorney*

12. Royal, Hon. C. Ashley, *United States District Judge*

13. Self III, Hon. Tilman, *United States District Judge*

14. Stetson, Catherine, *Counsel for Appellant*

15. United States of America, *Appellee*

C-1

16. Webb, Alex, *Third-Year Law Student*

17. Weigle, Hon. Charles H, *United States Magistrate Judge*

Circuit Rule 26.1-2(a) specifies that in criminal and criminal-related appeals, the Certificate of Interested Persons must also disclose the identity of any victims. The following (identified by their initials) are the minor victims of the underlying child cruelty charge to which Appellant's co-defendants, Zhanay Flynn and Antenesha Fritz, pleaded guilty:

18. *Minor Victims*: J.B.; J.C.; L.C.; J.H.; M.H.; T.H.; K.J.; C.K.; I.P.; P.P.; A.R.; B.R.; L.S.; Z.S.

No publicly traded company or corporation has an interest in the outcome of this appeal.

Respectfully Submitted,

*/s/ Catherine E. Stetson*
Catherine E. Stetson
Counsel for Appellant
University of Virginia
School of Law
Appellate Litigation
Clinic
580 Massie Rd,
Charlottesville VA
22903
(202) 701-4925

November 17, 2025

C-2

## TABLE OF CONTENTS

**Page:**

CERTIFICATE OF INTERESTED PERSONS & CORPORATE DISCLOSURE
STATEMENT .................................................................................................C-1

TABLE OF CITATIONS ................................................................................ iii

STATEMENT REGARDING ORAL ARGUMENT ...............................................1

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ....2

STATEMENT OF THE ISSUES .......................................................................2

INTRODUCTION ...........................................................................................3

STATEMENT OF THE CASE ..........................................................................6

   I.     CDC West .........................................................................................6

   II.    Mistreatment of Children at CDC West .......................................9

   III.   The Trial ..........................................................................................11

       A.     Classroom Management Of Toddler One ............................11

       B.     The Video Footage ...............................................................14

       C.     Teague's Observations and Lambert's Report .....................16

   IV.   The Trial and Verdict .....................................................................17

SUMMARY OF ARGUMENT ........................................................................19

ARGUMENT ...............................................................................................21

i

I.    No Conduct in the Record Satisfies § 20341(c)'s Definition of Child Abuse. ..................................................................................................21

    A.    Only Sufficiently Severe Conduct Falls Under these Statutes. ..........22

        1.    No Physical Injury Within the Meaning of § 20341 Occurred. ...24

        2.    No Mental Injury Within the Meaning of § 20341 Occurred.......29

    B.    Other Courts Agree that Child Abuse As Defined Under § 20341(c) Must Be Sufficiently Severe. .............................................................33

II.    If Any Conduct Here Did Fall Under the Statute, Then § 2258 Is Void for Vagueness As Applied to Lambert. ..........................................................38

    A.    If Read to Incorporate the Conduct in This Record, Section 2258 Failed to Put Lambert on Notice of Her Statutory Obligations. .........39

    B.    Section 2258 Should be Construed to Avoid Unconstitutionality. ......41

III.   There Was Insufficient Evidence to Support a § 2258 Conviction. ...........45

    A.    "Learns of Facts" ............................................................................46

    B.    "Reason To Suspect" .......................................................................50

    C.    "An Incident of Child Abuse" .........................................................53

CONCLUSION ..............................................................................................55

CERTIFICATE OF COMPLIANCE ...................................................................56

ii

# TABLE OF CITATIONS

**Cases:**                                                                                    **Page:**

*Brock v. Nellis*, 809 F.2d 753 (11th Cir. 1987) ......................................................46

*Cleveland v. United States*, 531 U.S. 12 (2000)....................................................42

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971)................................................41

*Connally v. General Construction Co.*, 269 U.S. 385 (1926) ...............................41

*Doe v. Naval Air Station, Pensacola, Fla.*, 768 F.2d 1229 (11th Cir. 1985) ..........23

*ECB USA, Inc. v. Chubb Ins. Co. of N.J.*, 113 F.4th 1312 (11th Cir. 2024) ...........31

*Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021)..................................................31

*\*Fischer v. United States*, 144 S. Ct. 2176 (2024).........................22–23, 25–26, 30

*Folson v. State*, 606 S.E.2d 262 (Ga. 2004) ...........................................................22

*Giacco v. Pennsylvania*, 382 U.S. 399 (1966) ........................................................39

*Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301 (11th Cir. 2009).............39

*Hibbs v. Winn*, 542 U.S. 88 (2004) .........................................................................25

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010).....................................39

*Hughey v. United States*, 495 U.S. 411 (1995).....................................................23, 25

*In re A.B.*, 999 A.2d 36 (D.C. 2010) .......................................................................36

*In re H.Q.*, 449 N.W.2d 75 (Wis. Ct. App. 1989).................................................37

*In re H.R.*, 206 A.3d 884 (D.C. 2019) ..............................................................35–36

*In re L.H.*, 925 A.2d 579 (D.C. 2007). ...................................................................36

*League of Women Voters v. Florida Secretary of State*, 66 F.4th 905
   (11th Cir. 2023) ...................................................................................................40

*McNally v. United States*, 483 U.S. 350 (1987) ....................................................42

*PETA v. Miami Seaquarium*, 879 F.3d 1142 (11th Cir. 2018)............22, 25–27, 30

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ........................................39

*S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370 (2006) ..............22, 25, 29

*Skilling v. United States*, 561 U.S. 358 (2010)................................................41–43

*Speech First, Inc. v. McCall*, No. 1:23-cv-411-DAE, 2023 WL 12086659 (W.D.
   Tex. Sep. 1, 2023), *vacated on other grounds*, 138 F.4th 219 (5th Cir. 2025)....44

*United States v. Brown*, 40 F.3d 1218 (11th Cir. 1994)....................................52–53

*United States v. Curry*, 760 F.2d 1079 (11th Cir. 1985) ..........................................2

*United States v. Daniels*, 685 F.3d 1237 (11th Cir. 2012) ...............................18, 21

*United States v. Duenas*, 891 F.3d 1330 (11th Cir. 2018) .........................18, 45–46

*United States v. Estrada*, 969 F.3d 1245 (11th Cir. 2020).....................................41

*United States v. Gaines*, 154 F.4th 1317 (11th Cir. 2025) .....................................38

*United States v. Gumbs*, 964 F.3d 1340 (11th Cir. 2020) ......................................31

iv

*United States v. Harbuck*, 146 F.4th 1073 (11th Cir. 2025)...............................18, 39

*United States v. Insco*, 496 F.2d 204 (5th Cir. 1974) .........................................23, 43

*United States v. Kepler*, No. 20-cr-00276-GKF, 2021 WL 4027203
  (N.D. Okla. Sep. 3, 2021), *aff'd*, 74 F.4th 1292 (10th Cir. 2023)............26, 34, 35

\*United States v. Louis*, 861 F.3d 1330 (11th Cir. 2017).....................45–47, 49, 52

*United States v. Mueller*, 74 F.3d 1152 (11th Cir. 1996).......................................38

*United States v. Parrel*, No. 2:12-cr-00244-KJM, 2013 WL 2302306
  (E.D. Cal. 2013) .................................................................................................44

*United States v. Pedro*, 999 F.2d 497 (11th Cir. 1993)...........................................46

*United States v. Rivera*, 944 F.2d 1563 (11th Cir. 1991)........................................54

*United States v. Rumely*, 345 U.S. 41 (1953)..........................................................43

*United States v. Smith*, No. 14-CR-99-JHM-CHL, 2016 WL 589890
  (W.D. Ky. Feb. 11, 2016).................................................................................33

*United States v. Stone*, 9 F.3d 934 (11th Cir. 1993)...............................................54

*United States v. Williams*, 553 U.S. 285 (2008)....................................................39

*Zimmerman ex rel. Zimmerman v. United States*, 171 F. Supp. 2d 281
  (S.D.N.Y. 2001) ...........................................................................................33–34

**Statutes:** **Page:**

16 U.S.C. § 1532 ...............................................................................................26–27

16 U.S.C. § 1538 ....................................................................................................26

18 U.S.C. § 3 ................................................................................................17

18 U.S.C. § 7 ..........................................................................................10, 16

18 U.S.C. § 13 ........................................................................................10, 16

18 U.S.C. § 1001 ..........................................................................................17

18 U.S.C. § 1346 .....................................................................................41–42

18 U.S.C. § 2246 ..........................................................................................24

*18 U.S.C. § 2258 .....................................2, 4, 6, 19–21, 33, 38–41, 43–46, 52, 54

*34 U.S.C. § 20341 ...........................2, 4, 19, 21–22, 24, 28–38, 40–41, 43, 46, 53

42 U.S.C. § 13031 ....................................................................................21, 34

D.C. Code. § 16-2301 ...............................................................................35–36

Ga. Code Ann. § 16-2-20 ...............................................................................16

Ga. Code Ann. § 16-5-70 ......................................................................10, 16, 22

Wis. Stat. § 813.122 ......................................................................................37

## Other Authorities:          Page:

104 Stat. 4806 (1990) ....................................................................................21

Amy Coney Barrett, *Congressional Insiders and Outsiders*, 84 U. Chi. L. Rev.
    2193 (2017) ..............................................................................................45

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012)................................................................................31, 45

*Black's Law Dictionary* (12th ed. 2024) ............................................................24

Circuit Rule 28-1 ...................................................................................................18

Depression, *National Institute of Mental Health* (2024),
   https://www.nimh.nih.gov/health/publications/depression ...............................30

Fed. R. App. P. 32 ................................................................................................56

Kyle Ziemnick, *The Association Game: Applying Noscitur a Sociis and Ejusdem Generis*, 111 Va. L. Rev. 1067 (2025).........................................................23, 44

Laceration, *Merriam-Webster Dictionary Online*, https://www.merriam-webster.com/dictionary/laceration (accessed Oct. 27, 2025)..............................26

*Webster's Third New International Dictionary*.......................................................27

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument in this case. The statute with which the government chose to charge Appellant in this case has rarely been prosecuted in its 35-year history, and Appellant believes that oral argument would be useful to this Court.

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

This court has subject-matter jurisdiction because this case involves a federal criminal prosecution arising from alleged conduct that occurred on federal property. Appellant filed a *pro se* Notice of Appeal on September 6, 2024. Doc 150. That filing was timely because it was made following the announcement of the verdict against her and preceded the final judgment entered on February 28, 2025. Doc 162; *United States v. Curry*, 760 F.2d 1079, 1079–80 (11th Cir. 1985). This appeal is from that final judgment.

## STATEMENT OF THE ISSUES

1.      18 U.S.C. § 2258 imposes criminal liability on a person who fails to make a report after "learn[ing] of facts that give reason to suspect that a child has suffered an incident of child abuse." As relevant here, "child abuse" is defined as "physical injury," including but not limited to "lacerations, fractured bones, burns, internal injuries, severe bruising or serious bodily harm," or "mental injury," meaning "harm to a child's psychological or intellectual functioning which may be exhibited by severe anxiety, depression, withdrawal or outward aggressive behavior, or a combination of those behaviors, which may be demonstrated by a change in behavior, emotional response or cognition." 34 U.S.C. § 20341(c). Can a defendant be found criminally liable under 18 U.S.C. § 2258 for failure to report mistreatment

2

of children such as pushing them around, yanking their arms, swinging children into each other, and spraying liquid at them?

2.    If 18 U.S.C. § 2258 does support criminal liability on those facts, is it unconstitutionally vague as applied?

3.    Was the evidence at trial sufficient to prove beyond a reasonable doubt that Appellant Latona Lambert had "learn[ed] of facts giving reason to suspect" a child had suffered abuse, triggering a duty to report?

## INTRODUCTION

Two teachers in a military childcare facility treated children entrusted to them abhorrently. They were rightfully held accountable when they pleaded guilty to child cruelty as defined by Georgia law.

But the federal government was unsatisfied. It dusted off a rarely charged federal statute and tried to shoehorn that Georgia state crime committed by two other people into federal criminal liability for the childcare facility's Director, Latona Lambert. The statute under which Lambert was charged required the government to prove that she had "learn[ed]" of facts that gave her "reason to suspect" that "child abuse" (as defined by federal law) had occurred, and that she had failed to report such conduct to the relevant authorities. 18 U.S.C. § 2258. Lambert was convicted on that sole charge. Her conviction should be reversed for three independent reasons.

3

First, the conduct in the record is not covered by the relevant federal statutes *at all*. Unlike Zhanay Flynn and Antenesha Fritz—the childcare providers themselves, who pleaded guilty to a federal offense defined by Georgia state law—Lambert was convicted under 18 U.S.C. § 2258, which incorporates the federal definition of "child abuse" found in 34 U.S.C. § 20341(c). And § 20341(c) defines "child abuse" very narrowly: it includes only severe physical or mental injuries. Because no conduct in the record constitutes "child abuse" under § 20341(c), there was no conduct that Lambert was required by federal law to report.

Second, if § 20341(c) *does* encompass conduct in this record, then the statute of conviction is unconstitutionally vague as a matter of law. As written, § 20341(c)'s definitions provide an ascertainable standard against which someone subject to § 2258 can determine when to file a report. If read expansively to include the conduct presented in this case, that standard is *un*ascertainable, and Lambert necessarily would have had to guess at its meaning. Valid criminal statutes do not work this way.

Third, even if the conduct at issue was both covered by the federal statute and the statute is not rendered impermissibly vague as a result, the record is insufficient to prove Lambert *knew* about that conduct during the relevant time period. *No one* told Lambert that any abuse had occurred until February 19, 2021, at which point she immediately reported it.

4

Acknowledging that it could not show actual knowledge of abuse prior to that date, the government instead relied heavily on the inference that Lambert had seen video footage of the mistreatment of children in that classroom. But at any one time, that footage was divided into many different mini screens on the monitor in Lambert's office, cycling every 20 seconds to different cameras. Lambert was in her office for roughly a quarter of her workday. And even assuming she was at her desk when the relevant footage played, the video monitor was on a separate desk to her left. Thus, to see the two childcare providers mistreating children during the charged period, Lambert would have needed to be sitting at her desk at the right time, turned away from her desk and facing the surveillance monitor at the right time, and looking at one of many small rectangles on her monitor at the right time—assuming further that that particular rectangle had even cycled onto her monitor at the time of the mistreatment. While that convergence of events is not impossible, it is certainly highly improbable—and plainly insufficient to find actual knowledge beyond a reasonable doubt.

Unable to show direct knowledge of the videos, the prosecution instead elicited testimony that Lambert was on notice of Flynn and Fritz violating certain facility policies, like using their phones or playing profane music around children. From this, the prosecution contended, Lambert had reason to be suspicious of Flynn and Fritz's classroom management, and from *that*, the prosecution argued that

5

Lambert *may* have, at some point, watched the surveillance footage and observed Flynn and Fritz mistreating the children. That is a far cry from proving criminal liability under § 2258 beyond a reasonable doubt. Again: there must be proof Lambert *learned* of facts that "give *reason to suspect*" that *a child had suffered abuse*. Establishing Lambert's knowledge of even obvious policy violations does not support the conclusion that she had reason to suspect that a child suffered a severe mental or physical injury.

It goes without saying that child abuse cases are difficult. They provoke visceral emotions, and for good reason. It is deplorable for childcare providers to mistreat children in their care. But the questions in this case pose familiar legal inquiries: did the record facts satisfy the federal statutory definition? If they did, does the statute provide sufficient notice of what constitutes chargeable conduct? And on top of all that, did the government actually prove its case?

The answer to each of these questions is "No." The judgment should be reversed.

## STATEMENT OF THE CASE

### I.  CDC West

Robins Air Force base in Warner Robins, Georgia maintains childcare facilities dedicated to serving the families of those working at the base. Doc 178 at

43. That facility, the Child Development Center (CDC), is split into two buildings, "CDC East" and "CDC West." *Id.*

CDC West has sixteen classrooms, Doc 127-6, each of which is broken into different age groups such as "Pre-school," "Infant," "Pre-Toddler," and "Toddler." *See* Doc 179 at 110–11, 152, 170. Operating a childcare facility as large as CDC West requires a full crew of leadership, teachers, and support staff—optimally, CDC West needed about 60 employees in the building each day. *Id.* at 216. But during the COVID-19 pandemic, staff shortages were a daily reality. As one CDC West employee explained, if everyone was at work on a given day around the time of the incidents, the CDC would have a maximum of 48 people working. *Id.* On an average day at that time, however, there were probably closer to 35. *Id.*

Latona Lambert was the Director of CDC West during the time period at issue—January and February of 2021. Sitting atop the chain of command, the CDC West Director is generally responsible for the operation of the entire facility. Lambert maintained oversight of staff, children, family, financials, and the physical facility itself, to name a few duties. *Id.* at 168. Others in CDC leadership—such as the assistant director and trainer—also performed supervisory roles, *see id.* at 168, 189, and would occasionally fill in for teachers as needs arose. *Id.* at 149–50.

CDC West's main facility had at least 34[1] security cameras throughout the building: each classroom contained two cameras mounted at different angles; there were more in the lobby and hallways; and there were exterior cameras, as well. *See* Doc 127-9 at 3; Doc 178 at 106. Each camera created a live video feed, and those separate video feeds were aggregated and displayed on television screens in the main lobby and at various desk monitors throughout the facility. Doc 179 at 38, 214–15. The monitor screens would, by default, show many camera feeds at a given time—up to 16 cameras per screen. *Id.* at 214. Because there were more than 16 cameras throughout the facility, however, the displays cycled every 20 seconds, shifting among the various cameras in the classrooms or to the cameras outside the building. *Id.*

Front desk staff monitored the live video feeds throughout the day on two television screens. *Id.* at 38, 171, 214–15. If Lambert was at her desk, she could turn to see a video monitor mounted on a second desk to her left, with its screen similarly split among the numerous cycling camera feeds. *Id.* at 172; Doc 127-9.

---

[1]Doc 127-9 at 3 includes a picture of the aggregated feed monitor in Lambert's office, and undersigned counsel counts at least 34 individual classroom views in addition to five "All" views broken down by type of classroom (pre-toddler, toddler, toddler playground, infant, and general "all camera"). But there is reason to think this is about half the total cameras; a scroll bar appears to take up less than half the height of the screen to the right of the various views.

Lambert spent most of each day outside her office, however. Doc 179 at 149. As former CDC Director Michelle Crawford described, Directors must have a "presence" throughout the facility by walking the halls and visiting the 16 different classrooms. *Id.* at 172. Each classroom in CDC West required a specific number of teachers to supervise the children. These teacher-to-child "ratios" had to be constantly maintained, and one of Lambert's duties involved checking each classrooms' ratios hourly. *Id*. at 216. Directors are also expected to support teachers when they need momentary relief (to use the restroom, for example) to ensure classrooms are kept "within ratio." *Id*. at 150, 216.

Particularly because of the short staffing at CDC West in early 2021, Lambert found herself going in and out of classrooms more often. *Id.* at 216–17. One front desk staffer estimated that Lambert spent only a quarter of the workday in her office, with the rest split "on the floor, at meetings, or down at [CDC] East." *Id.* at 218.

Every classroom employee at the CDC was required to complete an annual training on identifying and reporting child abuse. *Id.* at 26, 108, 169. And every employee in the building was a mandatory reporter. *Id.* at 169.

## II.  Mistreatment of Children at CDC West

On February 19, 2021, a childcare provider named Saengkul Teague met with Lambert to report recent incidents of a child having their arm yanked by a care provider in the "Toddler One" classroom. *Id.* at 27; Doc 127-2; Doc 127-5. Teague

told Lambert that she could not recall "the exact date and time" that the mistreatment occurred, but that it had "roughly" been "within that week." Doc 179 at 29. Lambert and Teague together immediately called in a report while Teague was still in Lambert's office. *Id.* The Family Advocacy Program (the office that "helps investigators start investigating") began looking into the incident the following week. Doc 127-5; Doc 178 at 99. That inquiry closed two months later. Doc 179 at 11.

In the spring of 2022, the Air Force Office of Special Investigations began investigating anew. Doc 178 at 47. The investigation focused on about thirty days of surveillance footage captured in the Toddler One classroom, spanning from January to February 10, 2021. *Id*. at 46. Numerous incidents of child mistreatment in Toddler One were discovered in that footage, all perpetrated by two childcare providers: Zhanay Flynn and Antenesha Fritz. *Id.* at 114. Flynn and Fritz both pleaded guilty to cruelty to children in the second degree, a substantive offense defined by Georgia state law.[2] Doc 179 at 49, 80; *see* Ga. Code Ann. § 16-5-70(c).

Latona Lambert did not abuse any children. Yet federal prosecutors charged her with failure to file a report after "learn[ing] of facts that give reason to suspect

---

[2] Flynn and Fritz formally pleaded guilty to violating 18 U.S.C. §§ 7(3) and 13. Doc 65; Doc 67. Those statutes merely import Georgia state crimes onto the federal property where those crimes occurred. The substantive offense to which they pleaded guilty is defined by Ga. Code Ann. § 16-5-70(c).

that a child has suffered an incident of child abuse." 18 U.S.C. § 2258. As part of Flynn and Fritz's plea bargains, they agreed to testify against Lambert. Doc 179 at 50, 80.

## III.    The Trial

The prosecution acknowledged that it had no evidence that Lambert had "actual direct knowledge" of any instances of child abuse. *Id.* at 208. Instead, its theory was that Lambert knew of facts giving "reason to suspect" abuse based on inferences from various reports about the management of the Toddler One classroom and the multi-camera-cycling video feed. *Id.*; Doc 180 at 20. We address both in turn.

### A. Classroom Management Of Toddler One

Kiana Flynn worked in the Toddler One classroom the entire time she was employed there. Doc 179 at 46. She originally worked alongside two other teachers, including a lead teacher named Diane Riley. *Id.* at 47. Sometime in late 2020, while Flynn and Riley both still worked in Toddler One, Antanesha Fritz was assigned to Toddler One, too. *Id.* at 47, 78. Later, in November 2020, Riley left the CDC, leaving Toddler One with no lead teacher and Flynn and Fritz as co-teachers. *Id.* at 47.

Flynn and Fritz were good friends, *id.* at 62, but bad coworkers. Following Riley's departure from the CDC, friction built between them. Both testified that they complained to Lambert about having to work with the other. *Id.* at 50, 92. Flynn

11

testified that she told Lambert that the lack of a lead teacher caused confusion as to who had what role in the classroom. *Id.* at 48. She further testified that she told Lambert "things were going bad in the room" and that Fritz had developed affection for a child's father and would act inappropriately during pick-up. *Id.* at 51. Fritz testified that she also complained, asking Lambert if she could be reassigned out of Toddler One and instead just cover breaks for other teachers in the toddler area. *Id.* at 81.

Neither Flynn nor Fritz ever told Lambert that they or their co-teacher were mistreating the children in Toddler One.[3] *Id.* at 52, 92. But both indeed mistreated the children in their care. Flynn and Fritz claimed it began sometime between October and December of 2020. *Id.* at 48, 79. However, no one testified to having seen Flynn or Fritz actually physically mistreat any children before Teague ultimately reported the triggering incident to Lambert in February 2021.

Toddler One was a poorly run classroom. Infant childcare provider Bretta Goins testified that Flynn and Fritz used profanity in the classroom and would sometimes play music that was inappropriate for children. *Id.* at 110, 112–14. Goins reported the inappropriate music and profanity to Lambert in either January or

---

[3] At one point during cross-examination, Fritz indicated that she *did* tell Lambert that she mistreated the children in her care. Doc 179 at 85. She later changed her testimony, clarifying that she did not tell Lambert. *Id*. at 92.

February of 2021, *id*. at 121–22, telling Lambert that Flynn and Fritz "weren't nice to" the children in their care. *Id.* at 114.

CDC West's training and curriculum specialist, Dawn Witherington, also filled out "Monthly Health/Safety Checklist" forms after observing Flynn and Fritz. *Id.* at 98; *see* Doc 127-16. These forms captured a handful of CDC West policy violations, such as Flynn and Fritz placing their purses on a stool in the classroom, having a cell phone on the counter, not having labels on the shelves, and not having family pictures of the children on the classroom wall. *Id*. at 99–100. The forms also recorded that children would at times choose to sit in their cubbies in the classroom but noted that they would go on their own rather than being told to do so. That distinction mattered; children were allowed to be in the cubbies, but teachers were not allowed to tell them to go there as punishment. *Id*. at 102. In none of her observations did Witherington see any child abuse. *Id.* at 105.

Lambert and her leadership team at CDC West also had periodic staff meetings to share updates about what was going on in the building. *Id*. at 138, 146, 149. Witnesses testified that the topic of Toddler One came up at least once during these meetings, including concerns about profane language in the classroom and remarks that Flynn and Fritz were immature and childish. *Id*. at 121, 146, 150. No witness testified that the topic of child abuse or mistreatment ever came up during those meetings. The government acknowledged as much. *Id*. at 208.

13

**B. The Video Footage**

Because there were no eyewitness accounts of any child mistreatment, besides Flynn and Fritz's testimony secured as part of their plea bargains, the only direct evidence of children being mistreated was captured by the surveillance cameras in Toddler One. As part of his investigation, Air Force Office of Special Investigations Agent Justyn Zangwill received roughly 30 days of footage from January of 2021 through February 10th, 2021. Doc 178 at 41, 46.

Most of the footage Zangwill reviewed—and the only footage the jury saw— was collected from a single camera within Toddler One. *Id*. at 106–07. In total, Zangwill reviewed about 300 hours of footage from that one camera. *Id.* at 46. From this, he compiled a roughly 90-minute supercut video of select instances investigators flagged as mistreatment. *Id*. at 76. The video compilation depicted numerous appalling acts.[4] Children were shown being sprayed with liquids, yanked around, swung into other children, pushed down, and knocked into the wall. *Id.* at 23–24, 93. In other instances, children were hitting each other with books or fighting with each other, and neither Flynn nor Fritz intervened. *Id.* at 84, 86. Children appeared to be crying in some clips. *Id.* at 94–95. There were a couple occasions where one child was left with his pants down after using the bathroom and was not

---

[4] The video exhibit also includes at least one instance where identical footage is shown twice—despite representing that footage as occurring on two separate dates. *Compare* Gov't Exhibit 26 at 19:35–23:48 *with id.* at 1:14:30–1:18:43.

quickly assisted. *Id.* The footage also depicted children sitting in cubbies throughout the day. *Id.* at 89–90, 92–93. While the footage captured Lambert entering the classroom on occasion, children were never physically mistreated while she was present. *Id.* at 114.

Because there was no evidence that Lambert had actually *seen* the maltreatment shown on the video supercut, the government instead elicited testimony about Lambert's attention to various surveillance cameras in the past. One caregiver, Sheila Etheridge, testified that Lambert had previously used the cameras to catch her violating facility policy. For example, one morning before any children arrived, Etheridge was readying her classroom with an earbud in her ear. Doc 179 at 141, 143. Lambert came into the room and reminded her that she should not wear earbuds while in the classroom. *Id.* at 141. Lambert also caught Etheridge sitting on a couch while she was watching the children in her care, which was not allowed. *Id.* Two other employees gave similar testimony. Sabrina Hayward testified that she had once placed a child on a couch while cleaning up following lunch, after which Lambert called Hayward into her office and instructed her not to leave children on the couch without a toy to play with. *Id.* at 153. Another caregiver, Tamara Weston-Hollis, testified that one time at recess, Lambert walked into a room and found one of her children unaccompanied, after which she called Weston-Hollis into her office to review footage in order to determine what happened. *Id.* at 148.

### C. Teague's Observations and Lambert's Report

Saengkul Teague began working in Toddler One with Flynn and Fritz on January 29, 2021. Doc 178 at 56; Doc 179 at 27. On February 19th, Teague came to Lambert with a disturbing report: one of the caregivers in Toddler One had yanked a child by the arm. Lambert immediately called the Family Advocacy program to report the incident while Teague was still in the room. Doc 178 at 99; Doc 179 at 28, 35.

The Family Advocacy investigators opened a case the following week. Doc 178 at 63. At some point, Family Advocacy transferred the investigation to the Air Force Security Forces. *Id*. at 42. That investigation ended in April 2021. Doc 179 at 11.

Over a year later, however, a United States Attorney, the Federal Bureau of Investigation, and the Air Force Office of Special Investigations agreed to conduct a further joint investigation focused on Flynn and Fritz (who both had long since left CDC West). *Id*. at 14–15. On October 11, 2022, an Assistant United States Attorney filed an indictment against Flynn and Fritz alleging, among other things, that they had committed cruelty to children in the second degree in violation of Georgia Code §§ 16-5-70(c) and 16-2-20 and 18 U.S.C. §§ 7(3) and 13. This indictment also included one misdemeanor count directed at Lambert, alleging that she had violated 18 U.S.C. § 2258 by failing to make a report after learning of "facts that give reason

16

to suspect that a child has suffered an incident of child abuse." Doc 1 at 18. Lambert pleaded not guilty. Doc 31.

Flynn and Fritz pleaded guilty to cruelty to children in the second degree in May of 2023. Doc 65; Doc 67. Soon thereafter, the government filed a superseding indictment asserting two new felony counts against Lambert: accessory after the fact, 18 U.S.C. § 3, and making false statements, 18 U.S.C. § 1001. Doc 86. The case went to trial.

## IV.    The Trial and Verdict

Trial was held in April 2024 before District Judge C. Ashley Royal. Doc 121. It lasted three days. Doc 121; Doc 122; Doc 123.

Judge Royal initiated a bench conference with counsel three times during the government's case-in-chief. Doc 179 at 100, 131, 196. The first time, Judge Royal told the government that it sounded like the government was "really stretching here to make out this case." *Id*. at 100–01. He warned that without "some good evidence" the government would "have a verdict directed against" it. *Id.* at 101.

Judge Royal reiterated his "concern about this case" later that day. *Id.* at 131. He walked through the testimony of five witnesses that each suggested Lambert never knew of child mistreatment before Teague's report, and he noted that Teague's testimony suggested Lambert "immediately" called Family Advocacy when she learned of the problem. *Id*. He reiterated his confusion to the government: "I don't

17

understand how this supports any of the elements of the indictments of the three counts that you have presented." *Id*. at 132.

After the Government rested its case-in-chief, Lambert's counsel twice moved for a directed verdict. *Id*. at 201, 233. Among other things, Lambert's counsel argued that the government "mischaracterize[d] the evidence when it says that [Lambert] automatically knew" about the children being mistreated. *Id*. at 202. The prosecutor acknowledged in response that this had "never been a case where we anticipated showing actual direct knowledge." *Id.* at 208. Instead, she explained, the prosecution's theory was one of "deliberate ignorance": "Ms. Lambert is being told all of these things that I believe we should be allowed to argue are reasonable inferences from the evidence that she should have followed up." *Id.*

The jury acquitted Lambert of both felony counts but found her guilty of failure to report under 18 U.S.C. § 2258. Doc 180 at 93; Doc 150.[5]

All three legal issues in this case are reviewed *de novo*. *United States v. Daniels*, 685 F.3d 1237, 1244 (11th Cir. 2012) (statutory interpretation); *United States v. Harbuck*, 146 F.4th 1073, 1076 (11th Cir. 2025) (vagueness challenges); *United States v. Duenas*, 891 F.3d 1330, 1333 (11th Cir. 2018) (sufficiency of evidence); *see infra* at 21, 39, 45 (discussing these standards further).

---

[5] As required by Circuit Rule 28-1(i)(i), undersigned counsel notes that Ms. Lambert is not currently incarcerated.

**SUMMARY OF ARGUMENT**

There are three independent reasons to vacate Ms. Lambert's conviction. First, as a matter of law, no conduct in the record constitutes "child abuse" as narrowly defined by 34 U.S.C. § 20341(c). The only types of child abuse that could conceivably have occurred are physical or mental injury, each defined by federal law. Two different canons of statutory interpretation teach that only sufficiently severe conduct falls under those definitions, and there is no evidence in the record of any conduct rising to that level. Because none of the conduct here even comes close to the required level of severity, reversal of Lambert's conviction is warranted as a matter of law.

Second, if this Court concludes otherwise, § 2258 is void for vagueness as applied to Lambert. Statutes must provide some ascertainable standard that gives fair notice to determine what conduct is necessary to establish guilt; otherwise, such laws are unconstitutionally vague. Section 2258 assigns liability to people who fail to make a report after one "learns of facts that give reason to suspect that a child has suffered an incident of child abuse." 18 U.S.C. § 2258. Section 2258 incorporates a definition of "child abuse" which lists a series of severe conduct constituting physical or mental injury. If the statute is read to incorporate *less* severe conduct, its standard becomes unascertainable, and the statute becomes unconstitutionally

19

vague. To avoid finding § 2258 unconstitutional, this Court should construe it narrowly so that it does not incorporate less severe conduct.

Third, even if this Court interprets § 2258 differently, there was insufficient evidence to prove that Lambert had actual knowledge of facts that would "give reason to suspect" child abuse. The District Court noted—and the government admitted—that no one ever told Lambert that potential abuse had occurred until Teague did so on February 19, 2021. Lambert then immediately reported the incidents. So the government instead relied on the inference that Lambert might have seen Flynn and Fritz mistreating children on the video footage, among the sixteen rotating fields on her screen. But the statute requires that Lambert "*learn[ed] of*" facts triggering the need to report—not that she *might* have learned of those facts. And on this record, the odds that Lambert actually *saw* the incidents in real time are near zero.

The trial record establishes that Lambert was told that Flynn and Fritz were immature, disliked each other, and made poor judgments in the classroom. But mere knowledge of cause for concern is not remotely sufficient to prove beyond a reasonable doubt knowledge of facts giving rise to a suspicion of severe harm to a child. Lambert's conviction should be reversed.

20

**ARGUMENT**

## I. No Conduct in the Record Satisfies § 20341(c)'s Definition of Child Abuse.

"The interpretation of a statute is a question of law subject to *de novo* review." *United States v. Daniels*, 685 F.3d 1237, 1244 (11th Cir. 2012).

Latona Lambert was convicted of one count of violating 18 U.S.C. § 2258. That statute states:

> A person who, while engaged in a professional capacity or activity described in subsection (b) of section 226 of the Victims of Child Abuse Act of 1990 on Federal land or in a federally operated (or contracted) facility, or a covered individual as described in subsection (a)(2) of such section 226 who, learns of facts that give reason to suspect that a child has suffered an incident of child abuse, as defined in subsection (c) of that section, and fails to make a timely report as required by subsection (a) of that section, shall be fined under this title or imprisoned not more than 1 year or both.

18 U.S.C. § 2258. The term "child abuse" in § 2258 is defined in 34 U.S.C. § 20341.[6]

Section 20341(c)(1) defines child abuse as (among other things) the "physical or mental injury" of a child.[7] In turn, "the term 'physical injury' includes but is not

---

[6] Section 2258 uses the definitions from subsection (c) of the Victims of Child Abuse Act of 1990. That provision was originally codified at 42 U.S.C. § 13031. *See* 104 Stat. 4806–08 (1990). It was later moved to 34 U.S.C. § 20341.

[7] The other two types of child abuse—negligent treatment and sexual abuse—are not at issue here. Negligent treatment of a child under this statute "means the failure to provide, for reasons other than poverty, adequate food, clothing, shelter, or medical care." § 20341(c)(7).

limited to lacerations, fractured bones, burns, internal injuries, severe bruising or serious bodily harm." § 20341(c)(2). And the term "mental injury" means "harm to a child's psychological or intellectual functioning which may be exhibited by severe anxiety, depression, withdrawal or outward aggressive behavior, or a combination of those behaviors, which may be demonstrated by a change in behavior, emotional response or cognition." § 20341(c)(3).

Nothing in the record meets the high bar set by § 20341(c). [8]

### A. Only Sufficiently Severe Conduct Falls Under these Statutes.

Two related canons of statutory interpretation help resolve this case. First, "*noscitur a sociis* counsels that 'a word is known by the company it keeps.'" *PETA v. Miami Seaquarium*, 879 F.3d 1142, 1147 (11th Cir. 2018) (quoting *S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 378 (2006)). That canon means that statutory "words grouped in a list should be given related meaning." *Id.* (quoting same); *see Fischer v. United States*, 144 S. Ct. 2176, 2183 (2024).

---

[8] Flynn and Fritz pleaded guilty to a different crime: cruelty to children, defined by Georgia state law as causing children "cruel or excessive physical or mental pain." *See* Ga. Code Ann. § 16-5-70(c); Doc 65; Doc 67. The Georgia statute "leaves to the trier of fact, taking into account societal norms generally accepted, whether certain behavior inflicts 'cruel' or 'excessive' pain." *Folson v. State*, 606 S.E.2d 262, 266 (Ga. 2004) (quotation omitted).

The separate canon of *ejusdem generis* is a more specific subcategory of *noscitur a sociis*.[9] Kyle Ziemnick, *The Association Game: Applying Noscitur a Sociis and Ejusdem Generis*, 111 Va. L. Rev. 1067, 1070 (2025). *Ejusdem* applies when a general or catchall term (e.g., "other factors") appears next to an enumerated list of specific terms in a statute. *Hughey v. United States*, 495 U.S. 411, 419 (1995); *Doe v. Naval Air Station, Pensacola, Fla.*, 768 F.2d 1229, 1232 (11th Cir. 1985). The canon requires that the catchall term's meaning is limited such that it is "understood in light of the specific terms around it." *Hughey*, 495 U.S. at 419; *see also Fischer*, 144 S. Ct. at 2184 ("The idea is simply that a general phrase can be given a more focused meaning by the terms linked to it."). The canons' applicability is especially strong for criminal statutes, "which courts are compelled to construe rigorously in order to protect unsuspecting citizens from being ensnared by ambiguous statutory language." *United States v. Insco*, 496 F.2d 204, 206 (5th Cir. 1974).

Applied to the statutory definitions at issue in this case, these canons limit those definitions such that conduct only counts as physical or mental injury if it was sufficiently severe. And the conduct in the record was not sufficiently severe to fall within the ambit of either statutory definition.

---

[9] For simplicity's sake, this brief will refer to these canons as "*noscitur*" and "*ejusdem*."

**1. No Physical Injury Within the Meaning of § 20341 Occurred.**

Start with the text. Section 20341(c)(2) specifies that "the term 'physical injury' includes but is not limited to lacerations, fractured bones, burns, internal injuries, severe bruising or serious bodily harm." There was no record evidence of "lacerations, fractured bones, burns, internal injuries, [or] severe bruising." *See id.* Accordingly, there are only two statutory terms that could conceivably encompass conduct in the record: the phrase "serious bodily harm," and the "includes but is not limited to" phrase.

The law defines "serious bodily harm" as "[s]erious physical impairment of the human body; esp., bodily injury that creates a substantial risk of death or that causes serious, permanent disfigurement." Serious Bodily Harm, *Black's Law Dictionary* (12th ed. 2024); *see also* 18 U.S.C. § 2246(4) ("bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty"). These touchstones suggest that the phrase "serious bodily harm" requires a showing of risk of death or permanent injury. Again, nothing in the record rises to that level; there is, in fact, *no* evidence about any specific medical condition, let alone a lasting injury, suffered by a child. The most severe conduct in the record was children being hit, yanked, or shoved.

That leaves the phrase "includes but is not limited to," and this is where *noscitur* and *ejusdem* kick in. *Noscitur* applies whenever statutory words are "associated." *Fischer*, 144 S. Ct. at 2183. That includes when words appear in a list within a statute. *S.D. Warren Co.*, 547 U.S. at 378; *Miami Seaquarium*, 879 F.3d at 1147. The "includes but is not limited to" phrase is "associated" with the more specific terms because they all appear in one statutory list, and all are defining various types of physical injury. Therefore, *noscitur* applies. *Ejusdem* applies too: "includes but is not limited to" is a catchall term that appears in the list alongside more specific terms like "lacerations" and "burns." That general-specific combination in a list triggers *ejusdem*. *Hughey*, 495 U.S. at 419; *Fischer*, 144 S. Ct. at 2184.

Because the canons apply, the next step is to determine what makes the specific terms in the list (lacerations, fractured bones, burns, internal injuries, severe bruising, and serious bodily harm) similar. All those specifically listed terms plainly are severe—the type of injury for which one might seek medical attention. Certainly, that is true for "fractured bones." And "severe bruising" explicitly uses the word "severe" to show the injury must be serious; minor bruising cannot be included because it would render the word "severe" superfluous. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (rejecting interpretations that lead to superfluity). Lacerations are defined as "torn and ragged wound[s]." Laceration, *Merriam-Webster Dictionary*

25

*Online*, https://www.merriam-webster.com/dictionary/laceration (accessed Oct. 27, 2025); *see United States v. Kepler*, No. 20-cr-00276-GKF, 2021 WL 4027203, at *4 (N.D. Okla. Sep. 3, 2021) (small cut that did not require a band-aid was not a "laceration"), *aff'd*, 74 F.4th 1292 (10th Cir. 2023). And "serious bodily harm" requires a risk of death or permanent injury. *See supra* at 24.

The foregoing demonstrates that all the listed types of physical injury are relatively serious. Accordingly, because the specific terms in the list are all serious injuries, *noscitur* and *ejusdem* counsel that the term "includes but is not limited to" can only include similarly severe injuries, perhaps along the lines of a concussion or a dislocated bone. The statute as written does not encompass minor injuries or temporary pain. *See Fischer*, 144 S. Ct. at 2183–84.

*Miami Seaquarium* is instructive here. There, this Court used *noscitur* to interpret the Endangered Species Act. 879 F.3d at 1144, 1147. The provision at issue made it unlawful to "take" any endangered species. *Id.* (quoting 16 U.S.C. § 1538(a)(1)(B)). The word "take" was defined in turn to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" the animal. *Id.* (quoting 16 U.S.C. § 1532(19)). The plaintiff, PETA, argued that the Miami Seaquarium had "harassed" and/or "harmed" an orca named Lolita by placing her in a small tank, not giving her a "socially compatible companion," making her share a tank with

26

dolphins whose teeth scraped her skin, exposing her to prolonged sunlight, and other conduct related to the conditions of her captivity. *Id.* at 1145 & n.4.

This Court rejected PETA's arguments. *Id.* at 1147, 1150. It noted that the words "harm" and "harass" in the statute appeared in a list alongside the words "pursue, hunt, shoot, wound, kill, trap, capture, [and] collect," which triggered *noscitur*. *Id.* at 1147 (quoting 16 U.S.C. § 1532(19)). All those other listed words have a commonality: they reference "conduct that poses a threat of *serious* harm to an endangered animal." *Id.* (emphasis added). The words "hunt," "shoot," and "kill" relate to "deadly harm." *Id.* Meanwhile, "trap," "capture," and "collect" are about seizing an animal, which "pose[s] a threat of serious harm" to animals not already in captivity because bodily capture risks injuring the animal. *Id.* Finally, "wound" and "pursue" both imply inflicting serious injury onto an animal. *Id.* (citing *Webster's Third New International Dictionary* at 1848, 2638). The court thus concluded—using *noscitur*—that "'[h]arm' and 'harass,' which gather meaning from the surrounding terms, should be read as referring to conduct that poses a similarly serious threat." *Id.* And this Court said that *noscitur* ended the inquiry. *Id.* at 1148.

So too here. Just as the words "harm" and "harass" in the Endangered Species Act only include sufficiently severe harm or harassment, the term "includes but is

27

not limited to" in § 20341(c)(2) only includes those injuries posing a comparably serious risk to a person as the other listed terms.

Nothing in the record approaches that level of severity. Agent Zangwill painstakingly compiled the worst moments in that classroom into a 90-minute supercut extracted from over 300 hours of video. In that video, Flynn and Fritz yanked a child's arm, pushed children around, dropped a child on the floor, swung children into each other, sprayed liquid at children, and encouraged two-year-olds to fight each other. Again, that behavior is inexcusable. And had Flynn and Fritz gone to trial rather than pleading out, a jury might have concluded that their conduct constituted child cruelty under Georgia law. But under the federal statute here, none of that conduct is similarly severe to "broken bones," "lacerations," or "serious bodily harm."

The 90-minute video was the centerpiece of the government's case. And the cameras in Toddler One were always recording—meaning that *all* interactions between Flynn and Fritz and their children were captured. Doc 178 at 107. So there was no other classroom conduct to "suspect" other than what was captured on camera. None of that conduct amounted to "child abuse" as defined by the statute of conviction.

28

### 2.  No Mental Injury Within the Meaning of § 20341 Occurred.

It is questionable whether the government's theory at trial included mental injury at all. The prosecution only mentioned mental injury in passing during closing argument, speculatively asking the jury whether two instances "might" constitute mental injury. Doc 180 at 19–20. The first was a conjecture about the possibility that a child named Jesse suffered "psychological harm." *Id.* That could be a reference to other children repeatedly pushing or hitting Jesse while Flynn and Fritz did not intervene, which made him cry. Doc 178 at 78, 84–88, 93. The second was toddlers sitting in cubbies, which the prosecutor speculated "might" be a "change in behavior or emotional response." Doc 180 at 19–20. The prosecutor's argument itself, of course, is not evidence; and neither of the two cited instances constitutes "mental injury" under § 20341(c)(3).

Section 20341(c)(3) defines "mental injury" as "harm to a child's psychological or intellectual functioning which may be exhibited by severe anxiety, depression, withdrawal or outward aggressive behavior, or a combination of those behaviors, which may be demonstrated by a change in behavior, emotional response or cognition." *Noscitur* and *ejusdem* confirm that "mental injury," like its statutory counterpart "physical injury," must be severe. *Noscitur* applies because the definition contains several associated words in a list. *See S.D. Warren Co.*, 547 U.S. at 378. *Ejusdem* also applies to the extent this Court interprets the "may be exhibited

29

by" phrase as a catchall term akin to the "includes but is not limited to" phrase from the physical injury definition. *See* § 20341(c)(2)–(3); *Fischer*, 144 S. Ct. at 2184.

Just as with the "physical injury" list, the common theme of the "mental injury" list is that each listed item is a severe mental condition. For "severe anxiety," that is a given. Same for depression, a chronic mental illness with "severe symptoms" negatively affecting someone's "daily activities." Depression, *National Institute of Mental Health* (2024), https://www.nimh.nih.gov/health/publications/depression. "To be diagnosed with depression, a person must have symptoms most of the day, nearly every day." *Id.* "[S]everal persistent symptoms, in addition to low mood, are required for a depression diagnosis." *Id.*

Because the common theme of the list is severe mental conditions, *noscitur* and *ejusdem* limit the meaning of potentially amorphous words like "withdrawal" or the potential catchall phrase "may be exhibited by" such that only severe conditions are included. *See Fischer*, 144 S. Ct. at 2183–84; *Miami Seaquarium*, 879 F.3d at 1147 (limiting the word "harm" to harms as severe as the words listed in the governing statute). Accordingly, "withdrawal" must be severe and prolonged like "severe anxiety" and "depression," so one-off incidents are insufficient. And although "may be exhibited by" could mean that more types of psychological harm

30

fall under § 20341(c)(3) besides the listed words, those other types of psychological harm would have to be similarly severe to "severe anxiety" and "depression."

In addition to *noscitur* and *ejusdem*, a third principle of statutory interpretation independently confirms that all the types of mental injury listed in § 20341(c)(3) must be severe. The series-qualifier canon explains that "[w]hen there is a straightforward parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series." *ECB USA, Inc. v. Chubb Ins. Co. of N.J.*, 113 F.4th 1312, 1322, 1324 (11th Cir. 2024) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012))[10]; *see Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021) (using the series-qualifier canon to interpret another federal statute); *United States v. Gumbs*, 964 F.3d 1340, 1347 (11th Cir. 2020) (describing the series-qualifier canon as "a matter of grade-school grammar"). In *Chubb*, this Court held that the modifier "for financial institutions" applied to every item in the list: "banking finance, accounting, risk and systems analysis, design and implementation, asset recovery and strategy planning *for financial institutions*." 113 F.4th at 1316, 1325–26. It reasoned that the list involved a series of nouns separated only by commas, such that the modifier at the end of the list applied to every listed item. *Id.* at 1324.

---

[10] A "prepositive" modifier comes before the list; a "postpositive" modifier comes after.

The series-qualifier canon applies here, too. The modifier "severe" appears immediately before the parallel list of nouns "anxiety, depression, withdrawal or outward aggressive behavior." § 20341(c)(3). Accordingly, after applying the series-qualifier canon, the statute's definition of mental injury is equivalent to "harm to a child's psychological or intellectual functioning which may be exhibited by severe anxiety, [severe] depression, [severe] withdrawal or [severe] outward aggressive behavior, or a combination of those behaviors, which may be demonstrated by a change in behavior, emotional response or cognition." *See* § 20341(c)(3).

The record contains no conceivable mental injury severe enough to fall under the statute. Take the prosecution's two cited pieces of evidence in turn. Regarding Jesse, it is unclear what the mental injury would be; all the instances of conduct directed at Jesse appear to be physical in nature. *See* Doc 178 at 78, 84–88, 93. If the alleged "mental injury" is simply that Jesse, a two-year-old, was twice recorded crying, that falls well short of proving severe anxiety, severe depression, or similar symptoms. As for the government's cubby argument, two-year-olds sitting in wooden cubbies does not suggest "severe" anxiety, severe depression, or the like. Nor, indeed, was there evidence in the record proving this was a *change* in behavior at all: the government introduced no evidence about whether any two-year-olds routinely sat in cubbies *before* Flynn and Fritz were in charge of the classroom. And it is impossible to tell whether children's behavior changed—much less whether it

32

changed markedly or severely—without evidence of what their behavior was beforehand.

### B. Other Courts Agree that Child Abuse As Defined Under § 20341(c) Must Be Sufficiently Severe.

Prosecutions under 18 U.S.C. § 2258—Lambert's statute of conviction—are rare: undersigned counsel are aware of only one other § 2258 prosecution in the 35 years since Congress enacted the statute. *See United States v. Smith*, No. 14-CR-99-JHM-CHL, 2016 WL 589890 (W.D. Ky. Feb. 11, 2016). Cases interpreting § 20341 or analogous statutes are likewise few and far between, but they are instructive nevertheless.

In *Zimmerman ex rel. Zimmerman v. United States*, the Southern District of New York analyzed a case arising under Section 20341(c) (then codified at 42 U.S.C. § 13031). 171 F. Supp. 2d 281 (S.D.N.Y. 2001). There, three children residing in West Point military housing reported to a cadet that the father of one of the children had behaved inappropriately during sleepovers at his house. *Id.* at 285. The cadet's report to the Chaplain's office stated that the girls had awoken in the night on multiple occasions to find the defendant standing over them, breathing on them, or touching them. *Id.* at 285, 295–96. The Chaplain's office did not act further on the report. *Id.* at 285. Some months later, the man sexually assaulted a child sleeping over at his house. *Id.* at 284. That child's father sued under the Federal Tort

Claims Act, claiming that West Point staff willfully failed to report suspected child abuse as mandated under 42 U.S.C. § 13031 (now § 20341(c)). *Id.* at 283–84.

On the government's motion to dismiss, the *Zimmerman* court held that the conduct described in the cadet's report did not describe "physical injury" under the statute. *Id.* at 296. Nor did it indicate that the girls had suffered any "mental injury," despite the conduct being distressing to the girls. *Id.* The court ultimately declined to dismiss the case at the 12(b)(6) stage, concluding that other information not contained in the complaint might shed more light on the cadet's report; but the court also observed that the government might be entitled to summary judgment at the appropriate time, "[g]iven the statutory reporting parameters which are quite specific and quite narrow." *Id.*

In *Kepler*, the Northern District of Oklahoma considered a different statute, 18 U.S.C. § 3509(a)(4), whose definition of "physical injury" is nearly identical to § 20341(c)(2)'s. *Kepler*, 2021 WL 4027203, at *4. The court addressed whether it was "physical abuse" to fire gunshots in the direction of a child, which caused concrete shrapnel to cut the child's arm. *Id.* at *1, *4. Analyzing the statutory definition's ordinary meaning, the court explained that "lacerations" must be deep, "ragged wound[s]," and "serious bodily injury" often involves a risk of death or permanent injury. *Id.* at *4. It then held that the shooting was not "physical abuse." *Id.* While the gunshot debris cut the child's arm and drew blood, it was a "little nick"

34

that "did not require a Band-Aid." *Id.* Thus, the cut was not "of the serious nature required to constitute physical injury" under that specific statutory definition. *Id.*[11] Firing a gun in a child's direction, resulting in him being cut by shrapnel, is far more severe than anything Flynn and Fritz did in the record here; yet the conduct in *Kepler* still was not "physical abuse" under the narrow statutory definition.

Certain state statutes provide useful guidance, too. District of Columbia law defines "physical injury" of a child as "bodily harm greater than transient pain or minor temporary marks." D.C. Code. § 16-2301(30). The statute as originally proposed would have used a definition identical to that found in 34 U.S.C. § 20341(c)(2). *See In re H.R.*, 206 A.3d 884, 887 (D.C. 2019). That proposed definition drew backlash, including from the U.S. Attorney's Office for D.C., which argued the definition was "too narrow" and recommended amending the bill to define "physical injury" as "any bodily harm greater than transient pain or minor temporary marks." *Id.* The District of Columbia Council ultimately adopted that amended definition. *Id.* at 888.

*In re H.R.* is instructive here for two reasons. First, it confirms that 34 U.S.C. § 20341(c)(2)'s definition of physical injury is "narrow"; the identical statutory definition was criticized by the D.C. federal prosecutor's office for not prohibiting a

---

[11] The Tenth Circuit affirmed, though it appears the defendant on appeal did not contest the district court's holding with respect to "physical injury" as defined by § 3509. 74 F.4th 1292 (10th Cir. 2023).

sufficiently broad swath of harmful conduct. Second, *In re H.R.* compares the language codified in § 20341(c)(2) to the "greater than transient pain" definition the Council ultimately adopted, with the latter encompassing more conduct. If D.C.'s *broader* standard does not encompass merely transient pain or minor temporary marks, then Section 20341(c)(2)'s *narrower* standard cannot either.

Moreover, even under D.C. law's broader standard for "physical injury," conduct likely more severe than anything in this record still fell short of the statute's ambit. In one D.C. case, a mother struck her daughter and threw her to the floor. *In re L.H.*, 925 A.2d 579, 581 (D.C. 2007). That produced "discoloration" (bruising) on the child's arm due to "surface trauma"; the child went to the hospital but did not require any treatment. *Id.* Applying D.C.'s definition for "physical injury," the court held that no child abuse occurred. *Id.* It reasoned that the slapping, throwing to the floor, and bruising merely constituted "transient pain or minor temporary marks" and thus was not "physical injury" as defined by D.C. Code § 16-2301(30). *Id.* Similarly, another D.C. case found that whipping a child with a belt did not produce "physical injury" where there was no evidence of anything greater than "transient pain or minor temporary marks." *In re A.B.*, 999 A.2d 36, 47 (D.C. 2010).

Compare those outcomes to this case. The mistreatment here was *less* severe than the conduct in those D.C. cases, while the federal statute here requires *greater* severity of injury, creating an even wider mismatch between statute and conduct.

36

Because there is no evidence here of anything "greater than transient pain or minor temporary marks," § 20341(c)(2) is not satisfied as a matter of law.

There are even fewer relevant cases about mental injury under § 20341, but the Wisconsin case of *In re H.Q.* is instructive. 449 N.W.2d 75 (Wis. Ct. App. 1989). Wisconsin state child abuse law prohibited causing children "emotional damage," with a definition nearly identical to § 20341(c)(3)'s definition of "mental injury." *See id.* at 76 (quoting Wis. Stat. § 813.122(1)(e) ("emotional damage" means harm exhibited by "severe anxiety, depression, withdrawal or outward aggressive behavior")). *In re H.Q.* involved a chronically alcoholic father who drove drunk with his kids in the car, became so drunk around his kids that he "passed out for several hours" and could not walk, and routinely directed angry, disparaging comments at his children. *Id.* at 76–77. The children cried as a result, and one of them needed counseling. *Id.* at 77. The Wisconsin Court of Appeals concluded that all this still fell short of the statutory definition: there was no evidence that the children displayed signs of "severe anxiety, depression, withdrawal or outward aggressive behavior." *Id.* at 78 (quoting Wis. Stat. § 813.122(1)(e)). Merely being upset, crying, and even seeking counseling, were not severe enough. *Id.*

Again, compare those facts to these. Here, the prosecutor's closing argument gestured at two instances of two-year-old Jesse crying, and of children sitting in cubbies on occasion. Doc 178 at 51, 84, 87, 91, 93. There is no evidence in the record

37

that any of the children displayed signs of "severe anxiety, depression, withdrawal or outward aggressive behavior," or that they required counseling. Indeed, there was no specific evidence offered *at all* as to any of the children's mental states.

* * *

The few cases that analyze § 20341 or similarly worded statutes agree that they encompass only severe physical or mental injury. So to be convicted, Lambert needed to "learn[] of facts that give reason to suspect" that kind of *severe* physical or mental injury. *See* § 2258.

The centerpiece of the government's case against Latona Lambert was the 90-minute supercut video showing Flynn and Fritz repeatedly mistreating children in their care. None of that conduct, however, was severe enough to constitute "child abuse" under the federal statute of conviction, and no other facts in this record could independently have given rise to "reason to suspect" child abuse. That deficiency warrants a judgment of acquittal. *See United States v. Gaines*, 154 F.4th 1317, 1318 (11th Cir. 2025) (vacating conviction and remanding for entry of judgment of acquittal where "the statute doesn't cover [the defendant's] conduct"); *United States v. Mueller*, 74 F.3d 1152, 1159–60 (11th Cir. 1996) (similar).

## II.    If Any Conduct Here Did Fall Under the Statute, Then § 2258 Is Void for Vagueness As Applied to Lambert.

For the reasons outlined above, 18 U.S.C. § 2258 does not attach federal criminal liability for failure to report the mistreatment shown on this record. And if

38

this Court were to interpret § 2258 to sweep beyond the "severe" harm listed in the statute, that reading would render the statute void for vagueness as applied to Lambert. This provides another independent reason to reverse.

### A. If Read to Incorporate the Conduct in This Record, Section 2258 Failed to Put Lambert on Notice of Her Statutory Obligations.

A law is void for vagueness when, among other things, it fails to provide a person with fair notice of what is prohibited. *United States v. Williams*, 553 U.S. 285, 304 (2008). Courts review *de novo* "whether a statute is void for vagueness." *United States v. Harbuck*, 146 F.4th 1073, 1076 (11th Cir. 2025).

A statute which prohibits an action "in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application" violates the "due process of law." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1311 (11th Cir. 2009) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 629 (1984)). A statute is unconstitutional where it is "so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Id.* (quoting *Giacco v. Pennsylvania*, 382 U.S. 399, 402–03 (1966)). When evaluating vagueness challenges, courts "consider whether a statute is vague as applied to the particular facts at issue," not hypotheticals. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010).

Section 2258 assigns criminal liability to someone who fails to make a report after they "learn[] of facts that give reason to suspect that a child has suffered an incident of child abuse." 18 U.S.C. § 2258. As outlined above, the definition of "child abuse" relevant here "means the physical or mental injury" to a child. 34 U.S.C. § 20341(c)(1). Physical injury is defined with reference to a non-exhaustive list of severe harm. § 20341(c)(2) (including "but [] not limited to lacerations, fractured bones, burns, internal injuries, severe bruising or serious bodily harm"). And mental injury is similarly defined by a list of "severe" behavior. § 20341(c)(3).

Reading the statute to *also* criminalize Lambert's failure to make a report upon "learn[ing]" this record's facts presents a significant vagueness problem. *League of Women Voters v. Florida Secretary of State*, 66 F.4th 905, 947 (11th Cir. 2023), helps explain why. The statute at issue in *League of Women Voters* prohibited "engaging in any activity *with the . . . effect* of influencing a voter." *Id.* This Court reasoned that "[k]nowing what it means to influence a voter does not bestow the ability to predict *which* actions will influence a voter." *Id.* (emphasis added). That in turn meant the statute failed to give people notice of what conduct was prohibited, so it was unconstitutionally vague. *Id.* In so holding, this Court applied the longtime principle that statutes which fail to provide an ascertainable standard to determine what conduct is necessary to establish guilt are unconstitutionally vague. *Id.*; *see*

40

*Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (citing *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926)).

Section 2258 *does* provide a standard; it incorporates the definition provided by § 20341(c) which in turn lists a series of severe conduct that constitutes physical or mental injury. 34 U.S.C. § 20341(c)(2)–(3). However, if those definitions were read to include the far less severe conduct present on this record, that purported standard would become unascertainable, requiring instead that someone "guess at its meaning." *Coates*, 402 U.S. at 614 (quoting *Connally*, 269 U.S. at 391). No notice was given to Lambert that § 2258 meant anything other than what it said, and valid criminal statutes do not require defendants to guess at what they prohibit.

**B. Section 2258 Should be Construed to Avoid Unconstitutionality.**

If a statute presents potential vagueness problems construed one way, but "there is an interpretation of the statute that makes the statute constitutional," this Court "accept[s] that interpretation." *United States v. Estrada*, 969 F.3d 1245, 1265 (11th Cir. 2020) (citing *Skilling v. United States*, 561 U.S. 358, 405–06 (2010)). In *Skilling*, the Supreme Court explained that, "before striking a federal statute as impermissibly vague," federal courts should "consider whether the prescription is amenable to a limiting construction." 561 U.S. at 405–06.

The *Skilling* Court was called upon to interpret 18 U.S.C. § 1346, which defines the term "scheme or artifice to defraud" as used in the federal mail and wire

41

fraud statutes to include "a scheme or artifice to deprive another of the intangible right of honest services." *Skilling*, 561 U.S. at 402. Enacted in 1988, Section 1346 reinstated the honest-services doctrine that had been displaced the previous year by the Court's decision in *McNally v. United States*. *Id.* at 401. Prior to 1987, all courts of appeal had adopted "the honest-services theory of fraud" which "interpreted the term 'scheme of artifice to defraud' [in the mail fraud statute] to include deprivations not only of money or property, but also of intangible rights." *Id.* at 400. One intangible right that courts of appeals recognized was the right to "honest services"—essentially the right to contract in the absence of corrupt acts such as bribery. *Id.* *McNally* held, however, that a public official could not be convicted of mail fraud for defrauding citizens of the right to "honest services" through accepting bribes or kickbacks. *Skilling*, 561 U.S. at 402–03; *McNally v. United States*, 483 U.S. 350, 360 (1987). The Court concluded that "[i]f Congress desires to go further, it must speak more clearly than it has." *McNally*, 483 U.S. at 360. Congress responded by enacting § 1346 "specifically to cover one of the 'intangible rights' that lower courts had protected . . . prior to *McNally*: 'the intangible right of honest services.'" *Skilling*, 561 U.S. at 402 (quoting *Cleveland v. United States*, 531 U.S. 12, 19–20 (2000)).

While it was clear to the *Skilling* Court that Congress had intended § 1346 to reach the "core" of the pre-*McNally* case law—which attached liability to "*at least*

bribes and kickbacks," *id.* at 408—it was not clear that Congress meant to proscribe "a wider range of offensive conduct" than that core. *Id.* The Court concluded that adopting an interpretation that would reach that wider range would "raise the due process concerns underlying the vagueness doctrine." *Id.* at 409. In order "[t]o preserve the statute without transgressing constitutional limitations," the *Skilling* Court held that the statute only criminalized that "bribe-and-kickback core of the pre-*McNally* case law." *Id.*

Mapping those instructions onto this case: it is clear Congress intended to criminalize at least the conduct it explicitly listed in defining child abuse for purposes of § 2258. All available statutory canons counsel that Congress did not intend to also reach less severe conduct. The applicability of those canons is particularly strong in the criminal context because "courts are compelled to construe" criminal statutes "rigorously in order to protect unsuspecting citizens from being ensnared by ambiguous statutory language." *Insco*, 496 F.2d at 206. Thus, in the event that a broader alternative construction is even available, this Court should adopt the narrower construction of § 2258 and § 20341(c) in order to avoid a broader construction that would be unconstitutionally vague. *United States v. Rumely*, 345 U.S. 41, 45 (1953); *see, e.g.*, *Skilling*, 561 U.S. at 405–06.

District courts in other circuits have applied similar reasoning to statutes that may otherwise pose vagueness concerns. For example, in *United States v. Parrel*,

the court reasoned that even if the word "improper" in a regulation prohibiting "improper disposal" was ambiguous, the *noscitur* canon would cure the vagueness. No. 2:12-cr-00244-KJM, 2013 WL 2302306 at *3 (E.D. Cal. 2013). Because the statute was titled "Preservation" and the regulation was aimed at the disposal of "rubbish," the court reasoned that the phrase "improper disposals" included only those disposals "of rubbish that work[] against the preservation of property." *Id.* And therefore it was not vague. *Id.* Similarly, in *Speech First, Inc. v. McCall*, the court applied *ejusdem* to a policy that prohibited using university resources to "influence the election or nomination of a person for a state, local, or federal office *or for similar partisan political activities*." No. 1:23-cv-411-DAE, 2023 WL 12086659 at *10 (W.D. Tex. Sep. 1, 2023), *vacated on other grounds*, 138 F.4th 219 (5th Cir. 2025). The court noted that while the "similar partisan political activities" phrase "may be vague on its own," it obtains a limited construction through the use of *ejusdem*, applying only to "things of the same kind as election or nomination to office." *Id.*

That principle applies here. As outlined above, either canon can sufficiently constrain § 2258 to save it from vagueness problems as applied to Lambert. Indeed, ordinary readers tend to understand statutes in-line with linguistic canons of statutory interpretation like *noscitur* and *ejusdem*. Ziemnick, *The Association Game*, 111 Va. L. Rev. at 1087 (citing Scalia & Garner, *Reading Law* at 199; Amy Coney

44

Barrett, *Congressional Insiders and Outsiders*, 84 U. Chi. L. Rev. 2193, 2203 (2017)). Without that narrowed construction, however, this Court would confront a significant constitutional issue.

## III.    There Was Insufficient Evidence to Support a § 2258 Conviction.

Even if this Court disagrees that only severe harm is covered by the statutes in this case, and even if it disagrees that a broader interpretation of the statute would introduce constitutional concerns, the question remains whether there was sufficient evidence at trial showing beyond a reasonable doubt that Lambert had "learn[ed]" of "facts that give reason to suspect" that "child abuse" was occurring in Toddler One. The answer is straightforward: No.

Sufficiency of the evidence is reviewed *de novo*, while making "all reasonable inferences in favor of the jury's verdict." *United States v. Duenas*, 891 F.3d 1330, 1333 (11th Cir. 2018). "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Louis*, 861 F.3d 1330, 1333 (11th Cir. 2017) (quotation omitted).

To convict Lambert under 18 U.S.C. § 2258, then, the prosecution needed to prove beyond a reasonable doubt that: (1) Lambert learned of facts; (2) that gave

45

reason to suspect; (3) that a child had suffered an incident of child abuse, as defined by § 20341(c).

### A. "Learns of Facts"

Section 2258 specifies that liability attaches only when someone "learns" of certain facts and fails to act on them. When a criminal statute requires a defendant's knowledge of a fact for liability, the question is whether "a reasonable juror could find the essential element of knowledge beyond a reasonable doubt." *Duenas*, 891 F.3d at 1333. "[M]ere presence in the vicinity of" a crime is not sufficient to establish a defendant's knowledge, nor is a mere "intuition" that a defendant knew the necessary facts. *United States v. Pedro*, 999 F.2d 497, 501–502 (11th Cir. 1993) (internal quotations omitted). Rather, someone who "learns of facts" must have "actual knowledge" of them. The case of *Brock v. Nellis*, 809 F.2d 753 (11th Cir. 1987), confirms as much. There, this Court addressed an ERISA requirement that "actual knowledge" about a statutory violation is necessary for the statute of limitations to begin tolling. *Id.* at 755. The Court explained that the "actual knowledge" requirement is triggered when a plaintiff "learns of the facts that support his allegation of illegality." *Id.* "[I]t is not enough that [s]he had notice that something was awry." *Id.*

*United States v. Louis* exemplifies this Court's approach to sufficiency of the evidence as it relates to a defendant's knowledge of a critical fact. 861 F.3d 1330. In

46

*Louis*, two large cardboard boxes were loaded from a shipyard into the defendant's car. *Id.* at 1332. The defendant began driving his car away from the shipyard but was soon stopped by law enforcement, who had been tipped off about a potential drug distribution scheme. *Id.* When officers stopped the defendant's car, he exited the car and fled. *Id.* The agents searched the car and found cocaine in the two boxes. *Id.* The defendant was tried and convicted for possession with intent to distribute cocaine and conspiracy. *Id*.

On appeal, this Court explained that under the statutes of conviction, the government needed to prove beyond a reasonable doubt that the defendant knew "that his alleged crime involved a controlled substance." *Id.* at 1333. This Court held that the evidence at trial had fallen short: the prosecution had introduced no evidence that the defendant "knew that there was a controlled substance (as opposed to any other contraband)" in the boxes. *Id.* at 1334. Although "we can infer that Louis's presence and flight are evidence that he knew he was involved in something criminal," this Court explained, that was "not enough to prove that Louis knew the boxes contained a controlled substance." *Id.* And while other evidence suggested further that Louis "should have been suspicious that the boxes contained contraband," that still was not enough. *Id.* n.3. The government was required to prove beyond a reasonable doubt "every fact necessary to meet its burden," and it had not. *Id.* at 1334. The Court accordingly reversed the defendant's conviction. *Id.*

The evidence in this case was similarly insufficient to prove that Lambert had actual knowledge of facts giving reason to suspect that child abuse occurred. As a preliminary matter, the District Court observed—and the government conceded—that the government had introduced no evidence that Lambert *knew* acts of child mistreatment had occurred before the February 2021 incidents she immediately reported. *See* Doc 179 at 197 (Judge Royal: "You haven't established that she saw anything on the video about what was going on there."); *id*. at 201 (Judge Royal: "I've already said that you didn't establish that she saw any of that"); *id*. at 208 (Prosecution: "This has never been a case where we anticipated showing actual direct knowledge.").

That is quite right. As the Director of CDC West, Lambert was frequently out of her office, either doing rounds through the facility, relieving teachers who needed to step out, or at CDC East for meetings. *Id*. at 218. She spent an estimated quarter of her workday in her office. *Id*. When she *was* in her office, the aggregated video feed monitor was located on a separate desk, to her left from where she sat. Doc 127-9. As a matter of plain odds, the chance she would have been in her office at a particular time, looking at the surveillance monitor as it cycled to Toddler One just as an instance of reportable child misconduct occurred, was vanishingly small. The math might look something like this:

Agent Zangwill reviewed nearly 300 hours—18,000 minutes—of footage from one camera. Doc 178 at 66. The 90-minute supercut video of mistreatment Zangwill prepared for the jury thus represented 0.5% of the footage he reviewed. *Id.* at 67. That one camera was one of nearly three dozen located in various classrooms, hallways, the lobby, and outside the facility. Doc 179 at 214; Doc 127-9 at 3. And it was one of 16 video feeds aggregated on one monitor, which changed every 20 seconds to accommodate all 34-odd cameras. And Lambert was not at her desk for long stretches of her workday. To have "learn[ed] of facts that give reason to suspect that a child has suffered an incident" of abuse in the relevant timeframe, then, Lambert would need to have been watching the video feed from one of at least 34 cameras, shown on a fraction of the monitor screen to the left of her desk, at a time when she was *at* her desk, at a time that camera was on the screen, and at some point in which an incident of mistreatment occurred during the 0.5 percent of 300 hours of footage. One need not be an expert statistician to conclude that the probability of *all* those events occurring is extremely low.

Given all this, it is unsurprising that the government was unable to show that Lambert actually saw these incidents on her monitor. Doc 179 at 197, 201. Therefore, the jury could not have properly concluded, beyond a reasonable doubt, that Lambert had seen the footage. *See Louis*, 861 F.3d at 1333 (mere possibility that

49

defendant had particular knowledge insufficient to prove knowledge beyond a reasonable doubt).

### B. "Reason To Suspect"

In place of actual evidence that Lambert saw the incidents of mistreatment in Toddler One, the government instead offered what it called a "deliberate avoidance" theory: even if Lambert had not seen child abuse firsthand, she purportedly knew enough to suspect that it was occurring and did not act. Doc 180 at 30. As the prosecution put it: "We don't have to show that she actually knew" of the abuse; "[s]he just needs that reason to suspect." *Id.*; *see also id.* at 13 ("You do not have to be told that it's happening. What you need . . . is reason to suspect it."); *id.* at 82 (jury instruction defining "reason to suspect" as meaning that "some evidence existed that would lead an ordinary person to suspect that an incident of child abuse may have occurred").

The prosecution attempted to establish Lambert's "reason to suspect" by eliciting testimony from teachers Lambert had previously disciplined for policy violations that they believed she caught when monitoring the video feeds, and by pointing to comments made in meetings about Flynn and Fritz's immature conduct in the classroom. As the government put it, "if Ms. Lambert is watching the video so closely that she can catch Sheila Etheridge with an airpod in her ear, why would we conclude that she was not watching, at least sometimes, when all of these

50

instances of abuse had occurred when she had been being placed on notice through private meetings, through training documents, and through staff meetings?" Doc 179 at 201.

That is no match for evidence that Lambert had learned facts giving "reason to suspect" *that a child had suffered an incident of abuse*. For one thing, the fact that Lambert took immediate steps to discipline providers for CDC policy violations when seeing their behavior on the video feed, *see supra* at 15, further supports the conclusion that Lambert did *not* see any reportable mistreatment in Toddler One when it occurred. For another thing, the violations to which those witnesses testified typically occurred when little else was happening inside the classroom. Lambert twice observed Etheridge violating CDC West policy in the mornings before any children arrived. Doc 179 at 141, 144. She flagged Hayward for a policy violation at lunch time. *Id*. at 153. Yet another time, Lambert reviewed video footage *after* she visited a classroom and discovered a child alone during recess. *Id*. at 148.

The government also referenced comments made to Lambert in "private meetings" and "staff meetings" about Flynn and Fritz's management of Toddler One. *Id*. at 201. As the prosecutor put it, Lambert was told that Flynn and Fritz were "using profanity, being mean, talking loud to the children." *Id*. at 205; *see also* Doc 180 at 12–13 ("Why aren't they being read to? Why aren't they being talked to? Why isn't there a game? Why isn't there circle time?"). All of these might constitute

51

violations of childcare facility policies. They are not—and cannot reasonably be interpreted as—facts giving cause to suspect that a child has suffered severe mental or physical injury.

*Louis* is again a useful comparator. Although there was evidence in that case that the defendant knew there was *some* kind of contraband in the boxes, no evidence suggested he knew there were *drugs* in the boxes. 861 F.3d at 1334. Here, Lambert may have known that Flynn and Fritz had violated CDC policies. But § 2258 required her to know facts that would cause her to suspect *abuse*. And the inference from childcare facility policy violations to severe physical or mental abuse of a child is a far wider gulf than the (impermissible) inference from knowledge of contraband to knowledge of drugs. *See id.*

*United States v. Brown*, 40 F.3d 1218 (11th Cir. 1994), also provides a helpful framework in which to assess the evidence here. There, this Court reversed one defendant's conviction, concluding that the evidence was insufficient to show that he knew about a fraudulent scheme prior being informed about it on March 8, 1987. *Id.* at 1220, 1222. This Court observed that when the defendant *was* told on that date about the potential fraud, he quickly terminated his business relationship with the fraudulent party. *Id.* at 1222. The combination of the thin evidence prior to March 8 and the fact that the defendant "severed all ties immediately after he was alerted to

52

potential impropriety" meant that the evidence was not sufficient to establish that the defendant knew about any fraud prior to March 8. *Id.*

So too here: the government admits that none of its witnesses ever told Lambert about actual abuse occurring in Toddler One—just violations of CDC workplace policy. Doc 179 at 205 (Prosecution: "They didn't tell her about abuse, no, but they did tell her about policy violations."). And when Lambert *was* notified of potential mistreatment of children, she immediately filed a report. *Id*. at 29. As with the defendant in *Brown*, Lambert's immediate action upon learning of potential abuse is strong support for the conclusion that she did not know about any abuse prior to that date. *See* 40 F.3d at 1222.

### C. "An Incident of Child Abuse"

Section 20341(c)'s narrow definitions, discussed above at 24–33, are also relevant to the evidentiary inquiry. Because only severe conduct counts as "child abuse," the prosecution needed to prove beyond a reasonable doubt that Lambert had learned of facts giving reason to suspect a child had suffered *severe* mental or physical injury. For all of the reasons discussed above, the prosecution came nowhere close.

* * *

The District Court made a telling statement at the close of trial. When Lambert's counsel renewed his motion for judgment of acquittal following the

53

verdict, Judge Royal denied it, on the ground that the § 2258 offense could be satisfied by a "negligence theory," which he thought the prosecution had adequately established. Doc 180 at 94.

That was not correct. Again, to convict Latona Lambert under § 2258, the prosecution needed to prove beyond a reasonable doubt that Lambert had *learned* facts giving *reason to suspect* that *child abuse* had occurred. Mere negligence— assuming even that it could be gleaned from this record—is not enough. Indeed, even the prosecution's (dubious) "deliberate avoidance" theory required more than negligence. *See United States v. Stone*, 9 F.3d 934, 940 (11th Cir. 1993); *United States v. Rivera*, 944 F.2d 1563, 1570 (11th Cir. 1991) (both cited by the prosecution, Doc 111 at 35).

The District Court's closing observation was telling—and fatal to the prosecution's case.

## CONCLUSION

Zhanay Flynn and Antenesha Fritz mistreated the children in their care. That is beyond question. But Latona Lambert should not have been convicted of failure to report, where no conduct in this record rose to the level of "child abuse" under the federal statute; where any expansion of the statute to include the conduct here would render it unconstitutionally vague; and where—even spotting the first two issues— the record evidence fell far short of showing that Lambert had learned of any facts giving reason to suspect child abuse, triggering her reporting obligation.

For the foregoing reasons, the judgment of conviction should be vacated, and a judgment of acquittal should be entered on remand.

Respectfully submitted,

*/s/ Catherine E. Stetson*
Catherine E. Stetson
Counsel for Appellant
University of Virginia
School of Law
Appellate Litigation
Clinic
580 Massie Rd,
Charlottesville VA
22903
(202) 701-4925

November 17, 2025

**CERTIFICATE OF COMPLIANCE**

1.  This brief complies with type-volume limits of Fed. R. App. P. 32(g)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    [ X] this brief contains 12,970 words.

2.  This brief complies with the typeface and type style requirements because:

    [ X] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word*] in [*14pt Times New Roman*]

/s/ *Catherine E. Stetson*

Attorney for: Latona Lambert

Dated: November 17, 2025